**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

ANTHONY J. JOHNSON,          :

                            :    Civil Action No. 11-4677 (RMB)

          Plaintiff,      :

                            :

          v.              :         **OPINION**

                            :

WAYNE MAYNARD, ESQ., et al.,   :

                            :

          Defendants.     :

_____ :_____

      This matter comes before the Court upon two motions by the Plaintiff Anthony J. Johnson ("Plaintiff"), see Docket Entries Nos. 9 and 13, one seeking to amend his original complaint and one seeking reconsideration of this Court's prior order. See id. For the reasons detailed below, the motion to amend will be granted, and Plaintiff's amended pleading will be dismissed for failure to state a claim. Plaintiff's motion for reconsideration will be granted in form and denied in substance. See Pena-Ruiz v. Solorzano, 281 F. App'x 110, n.1 (3d Cir. 2008) (a motion for reconsideration is deemed "granted" when the court addresses the merits of that motion; however, the court may reach a disposition identical, either in its rationale or in its outcome, or in both regards, to the one previously reached). In light of the content of the complaint and Plaintiff's motions at bar, and taking notice of Plaintiff's other litigation commenced in this District prior to the instant matter but raising the identical challenges

to those raised here, the Court will terminate this matter as duplicative.

I.  BACKGROUND

According to the exhibits upon which Plaintiff relied, the events underlying Plaintiff's claims began unfolding at 5 a.m. on September 12, 2009, at a Wawa store located in Sicklerville, New Jersey ("Wawa Store").[1]  <u>See</u> Docket Entry No. 1-2, at 14. Specifically, Daphne Hill ("Hill") entered the Wawa Store and "attempted to use a stolen credit card" and a stolen debit card in order "to purchase cigarettes," "two T-mobile gift cards" and "ten Visa gift cards worth one hundred dollars each."  <u>Id.</u> Because the stolen credit card was issued in the name of Anna Kelden ("Kelden"), the cashier asked Hill to produce identification.  In response, Hill presented a driver's license issued in Kelden's name but bearing Hill's photo.  <u>See id.</u> Concerned with the high-dollar-value of the transactions, the cashier then summoned a manager, who also examined Hill's credit and debit cards, as well as the driver licence.  The manager noticed that one of the cards had a photo markedly different from that on the driver's license.  <u>See id.</u>

Upon realizing that the cards and driver's license were either stolen or forged, or some other form of fraud was being

_____

[1]  Wawa is Pennsylvania-headquartered franchise holding a chain of stores in New Jersey, Pennsylvania, Delaware, Maryland, Virginia and Florida; it employs over 18,000 people.  <u>See</u> http://www.wawa.com/wawaweb/About.aspx.

attempted, the "[m]anager . . . went to his office and contacted the [p]olice"; taking notice of that development, Hill left the Wawa Store and "fled in a Ford SUV" ("SUV").  Id.  The police stopped "a vehicle matching [the SUV]" the one in which Hill fled a short distance away from the Wawa Store.  Id.

When the SUV was stopped, the officers found it occupied by Kevin Spence ("Spence"), Hill, Plaintiff and Michelle Salamone ("Salamone").  Id.  After the four were ordered out of the SUV and searched, a large amount of cash, numerous "stolen credit cards," "fraudulent driver licenses" and Social Security documents issued to other persons' names were discovered.  All four were informed of their Miranda v. Arizona, 384 U.S. 436 (1966), rights and detained for further investigation.[2]  See id.

Hill, upon entering a Miranda waiver, made a statement informing the police of her drug addiction, which she supported by her fraudulent credit card schemes performed at various stores, such as Walmart, Target and Macy's, as well as at various hotels and casinos.  See id. at 14-15.  While naming Spence as her main co-conspirator, Hill stated that Plaintiff was the key player in the schemes since he was the one: (a) producing fraudulent driver's licenses and adding Hill's photograph onto them; and (b) stealing "credit cards at local movie theaters

---

[2]  Plaintiff asserted, in this matter, that he was not given his Miranda rights upon his arrest.

3

[where Plaintiff] crawled around on the floor," going through the pocketbooks of movie-goers. Id. at 15. Salamone, too, entered a waiver and made a statement wholly supporting Hill's account and implicating Spence and Plaintiff. Hill and Salamone also detailed Salamone's role, which was very limited.[3] See id.

Meanwhile, an investigation of the SUV revealed that it had been rented to Velada Gibson ("Gibson") who: (a) stated that the SUV was taken by Plaintiff, Gibson's acquaintance, without her permission; but (b) refused to provide police with any additional information; and ©) did not respond to police follow-up calls. See id. Upon that development, police officers had a search warrant issued as to the SUV. See id. That search revealed two driver's licenses hidden in the window cavity, one being Kelden's actual license and the other one falsely issued on Kelden's name but bearing Hill's photo, that is, the forged driver's licence that Hill attempted to use at the Wawa Store. See id. Also, a laptop was located on the "passenger seat"; inside it were

---

[3] According to Hill and Salamone's statements, Salamone met Hill, Spence and Plaintiff just two days prior to the Wawa Store incident; she went with them to a movie theater (where she merely watched a movie) and then took a road trip with them, during which she was asleep. See Docket Entry No. 1-2, at 14-15. Her involvement in Hill, Spence and Plaintiff's schemes was limited to a single withdrawal of funds through the use of a credit card Salamone either knew or suspected to be stolen; she handed the entire withdrawal to Hill, Spence and Plaintiff. See id. at 15. On September 12, 2009, i.e., the day of the Wawa Store incident, Salamone entered the Wawa Store together with Hill, but only to purchase a cup of coffee in a legitimate transaction. See id.

special "plastic blanks . . . used for [production of] fraudulent [d]river's [l]icenses." Id.  In addition, a Fargo Card Printer and spare cartridge were located in the trunk of the SUV;[4] the printer already had a special plastic card inserted in it, with "the back of a NJ [d]river's licence imprinted" on one side, while the other side was still left blank.  Id. at 16.

Hill, Spence and Plaintiff were charged with criminal offenses and "processed."  Id.  "Hill was released on her own recognizance," and "Spence posted bail," while Plaintiff failed to post bail and, thus, remained in custody.[5]  Id.  Thereafter, Hill, Spence and Plaintiff were indicted, see id. at 22, 39, and Plaintiff retained Wayne Maynard, Esq. ("Maynard") as his defense counsel.  See Docket Entry No. 2, at 2.  With Maynard's assistance, Plaintiff was eventually offered and accepted a plea, pursuant to which he pled guilty to a disorderly person offense. He was issued a $250 fine and no prison term was imposed.[6]  Id.

_____

[4]  Fargo Card printers are utilized to produce high-security documents verifying one's identity, e.g., driver's licenses.  See http://www.hidglobal.com/products/card-printers/fargo.

[5]  No charges were filed against Salamone.

[6]  However, right after his conviction on the New Jersey disorderly conduct charges, Plaintiff was placed in federal custody on the charges filed against him in the Eastern District of Pennsylvania.  See infra, this Opinion, note 10.  Plaintiff's arrest on the Eastern District of Pennsylvania charges took place on November 16, 2011.  See United States v. Johnson, Crim. Action No. 11-mj-1590 (E.D. Pa.) (docket entry dated Nov. 16, 2011).

After entering his plea, Plaintiff attempted to withdraw it, asserting that Maynard "manipulated" him into taking the plea by recommending to admit, during his plea hearing, that Plaintiff initially utilized one of his aliases, "Kevin Johnson," when the police stopped the SUV.[7] See Docket Entry No. 1-2, at 43.

Plaintiff also asserted that Maynard de facto coerced him to accept the plea by declining to make several motions Plaintiff desired and by proceeding in a fashion Plaintiff found unduly delayed, as well as by failing to inform Plaintiff that Hill had violated the terms of her release and "went on the run." Id. at 44. Concluding that, without Hill as the State's witness, "the prosecution had no case against [him]," Plaintiff deduced that the prosecutor and Maynard must have conspired to obtain his conviction by "forcing" Plaintiff to accept the plea offer.[8] Id. Claiming that he was also denied a speedy trial and effective assistance of counsel, and subjected to selective law enforcement /selective prosecution on the basis of his race,[9] Plaintiff moved

---

[7] Plaintiff is known to law enforcement officers under many aliases, e.g., "Larry Jones," "Anthony Johnson," "James Johnson," "Kevin Johnson," "Larry Johnson," "Kevin Willford," "Kevin Williams," etc. See Docket Entry No. 1-2, at 5.

[8] Plaintiff's submissions made in his other matter commenced in this District indicate that Hill's violation of her terms of release (that is, if such violation actually took place) was short-lived, since Hill pled guilty to the charges against her and was duly sentenced. See infra, this Opinion, note 14.

[9] It appears that Salamone was a Caucasian, while Plaintiff, Hill and Spence were African-Americans. It is on the

for withdrawal of his guilty plea.  See generally, Docket Entries
Nos. 1-2 and 2.

The state court denied his application, and his New Jersey
conviction remained intact. Two years passed.  Thereafter, being
incarcerated on federal charges, Plaintiff commenced the instant
matter.[10]  See Docket Entries Nos. 1 and 2.  Here, he asserted –

---

basis of this fact, Plaintiff alleged "racial profiling" and
"selective prosecution" / "selective law enforcement."  See
generally, Docket Entries Nos. 1-2 and 2.

 [10]  Plaintiff's initial federal action was United States v.
Johnson, Crim. Action No. 11-mj-1590 (E.D. Pa.).  The Eastern
District of Pennsylvania held Plaintiff's identity hearing and,
upon determining the same, transferred his prosecution to the
District of Connecticut ("D. Conn.").  See United States v.
Johnson, Crim. Action No. 11-mj-0297, Crim. Action No. 12-0027
(D. Conn.).  The Connecticut prosecution yielded: (a) Plaintiff's
trial to a jury; (b) his conviction on the charges of producing/
trafficking counterfeited access devices and fraud with
identification documents; (c) a 192-month term; and (d) $70,826
in restitution.  See id.  The Connecticut criminal complaint
stated that, prior to the Wawa Store incident, Plaintiff briefly
entered the general public upon his release from yet another
prison term; during that period, he was going to movie theaters
to crawl on the floor and steal credit cards from the purses of
female movie-goers, and then manufacturing false driver's
licences bearing the names of the owners of these stolen credit
cards but having the photo of Plaintiff's other co-conspirator, a
certain Jamie McGowan ("McGowan"), a Caucasian.  See id., Docket
Entry No. 1, at 3-4.  McGowan was using the stolen credit cards
and false driver's licenses produced by Plaintiff to purchase
high-dollar-value gift cards, which Plaintiff then re-sold "for
half of their face value."  Id. at 4.  Plaintiff's first counsel
moved for and was granted withdrawal of representation upon her
averment that Plaintiff was "repeatedly [accusing her of being]
in conspiracy with them (the government, the court, and the U.S.
Marshal's them (the government, the court, and the U.S. Marshal's
Service)."  Id. at 2 (parenthetical in original).  As soon as
Plaintiff had his second counsel appointed, he moved for that
attorney's dismissal.  See id., Docket Entry No. 56.  When that
motion was denied, the second appointed counsel himself moved for

7

as during his attempt to withdraw his New Jersey plea – that: (a) the New Jersey prosecution was malicious; (b) that Maynard must have conspired with both his prosecutor and the state judge to convict Plaintiff; and ©) that Maynard's performance was deficient since he recommended Plaintiff to accept the plea, refused to file the motions Plaintiff desired and, allegedly, did not inform him about Hill's violation of her terms of release. Plaintiff also asserted that Maynard coerced him into committing a perjury since Maynard suggested to him to aver, during the plea hearing, that Plaintiff had initially identified himself to the police as "Kevin Johnson" and Plaintiff did aver so.  See Docket Entries Nos. 1 and 1-2.

The overriding "theme" of Plaintiff's challenges is his disappointment with the fact that his New Jersey prosecution protracted long enough to allow the federal law enforcement officers to take him into custody for the purposes of the

_____

withdrawal, since – by then – Plaintiff had already filed a grievance against him, also asserting coercion and conspiracy between that attorney and the prosecutor.  Id. at 76; see also id., Docket Entry No. 108.  Even when Plaintiff's second counsel was designated to act as merely a stand-by, Plaintiff nonetheless insisted on full dismissal, still maintaining that his counsel must have been conspiring with the prosecutor.  See id., Docket Entry No. 167.  Meanwhile, Plaintiff's co-conspirator, McGowan, pled guilty.  See id., Docket Entry No. 80.  Moreover, a certain Lashirelle Bryant ("Bryant"), Plaintiff and McGowan's other co-conspirator, cooperated with the Government and acted as a Government witness against Plaintiff in the Connecticut matter. See id., Docket Entries Nos. 1 and 36.

Connecticut prosecution.  See Docket Entry No. 9, at 6-7 ("[The

prosecutor] and . . . Maynard . . . violated [Plaintiff's] civil

rights . . . by keeping [him] incarcerated, using delay tactics,

knowing that [he] was going to be[]indicted by the [U]nited

[S]states [A]tto[rney].  . . .  [The prosecutor and Maynard must

have engaged into a] conspiracy against [Plaintiff since they]

kept postponing [his New Jersey] case by requesting adjournments,

i.e., Maynard] made two of [such applications for adjournment,

and the prosecutor] made three of them . . . . [Plaintiff

believes that these applications were made] because the

Bridgeport [Connecticut] US Attorney[']s Office needed more time

to investigate [Plaintiff's federal] case. . . . [The prosecutor

violated Plaintiff's rights because he] gave the US Attorney[']s

[O]ffice . . . all the time they needed to build [Plaintiff's

federal criminal] case").[11]

Paramount here, all these claims had already been raised by

Plaintiff in another action he commenced in this District two and

a half months prior to his initiation of the instant matter.  See

Johnson v. Camden County Prosecutors Office et al. ("Johnson-I"),

Civil Action No. 11-3588 (RMB) (D.N.J.) (filed June 22, 2011).

Specifically, in Johnson-I, Plaintiff asserted that: (a) Maynard

_____

[11]  In other words, Plaintiff's challenges stem from his
disappointment over the "lost opportunity" to escape his federal
arrest and federal prosecution.

conspired with his New Jersey prosecutor to convict him; (b) the prosecutor and police officers engaged in "selective enforcement/ selective prosecution"; (c) the SUV was stopped and Plaintiff was detained without probable cause; and (d) the prosecutor maliciously prosecuted him.[12]  See id., Docket Entry No. 5, at 2-14.

Because Plaintiff's obscure Johnson-I challenges did not allow the Court to rule out that Plaintiff's claims were plausible but stated poorly due to his lack of legal sophistication, the Court found it warranted to proceed his false arrest and selective enforcement claims past the sua sponte dismissal state.  See id., Docket Entries Nos. 6 and 7.  All other claims were dismissed.  See id.

Fourteen months after commencement of Johnson-I, Plaintiff moved to amend his Johnson-I complaint.[13]  See id., Docket Entry No. 19.  A week after that motion, he filed a motion for "summary

_____

[12]  In addition, in Johnson-I, Plaintiff maintained that his Confrontation Clause rights were violated by Salamone's released, and that he was not given his Miranda rights upon his arrest.

[13]  In his first amended Johnson-I pleading, Plaintiff asserted that the police erred in believing Salamone and Hill's statements that Salamone's involvement was highly limited.  See Johnson-I, Docket Entry No. 19.  However, no statement made in Plaintiff's submissions made in Johnson-I or in this matter indicates that the police was provided with any information implicating Salamone in any act other than a single withdrawal of the funds she handed to Hill, Spence and Plaintiff; rather, Plaintiff is maintaining that the police should have investigated Salamone in the hopes of finding some inculpatory evidence.

judgment" asserting his entitlement to a default judgment.[14]  See
id., Docket Entry No. 20.  Thereafter, he renewed his motion for
appointment of pro bono counsel.  See id., Docket Entry No. 21.
These motions were denied by the Magistrate Judge.  See id.,
Docket Entries Nos. 22, 23.  In response, Plaintiff filed another
motion to amend and a motion for reconsideration.  See id.,
Docket Entries Nos. 24 and 25.  Those motions were also denied.
See id., Docket Entries Nos. 26 and 28.

     At that juncture, the Johnson-I Defendants were served and
filed an answer, see id., Docket Entries Nos. 30, 31 and 32; that
development prompted Plaintiff to file a multitude of letters and
motions, e.g., another "motion to amend," a "motion to produce,"
a "motion for extension of time," a "motion to take depositions,"
a yet another "motion to amend," a "motion to refile," another
"motion to amend," a "motion to deny Defendant's objections,"
still another "motion to amend," a "motion to compel," and
another "motion for summary judgment."  See id., Docket Entries
Nos. 29, 34, 35, 36, 40, 41, 43, 44, 45, 50, 51, 52, 60.  The

_____

     [14]  Plaintiff's Johnson-I submissions conceded that both
Hill and Spence pled guilty to the charges based on the schemes
they conducted jointly with Plaintiff; Plaintiff also conceded
that Hill and Spence were sentenced to three- and five-year
terms, respectively.  See Johnson-I, Docket Entry No. 19.
Plaintiff, however, insisted that Hill and Spence must have been
coerced into pleading guilty.  See id.

Magistrate Judge thereafter appointed Plaintiff <u>pro</u> <u>bono</u> counsel. <u>See</u> <u>id.</u>, Docket Entries Nos. 68 and 70.

However, while represented in <u>Johnson-I</u>, Plaintiff proceeded with litigating the instant matter <u>pro</u> <u>se</u>. The Court clarified to Plaintiff the pleading standard of Rule 8, as detailed in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), <u>i.e.</u>, the decision that established "the final nail-in-the-coffin for the 'no set of facts' standard" coined in <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957). The Court also explained to Plaintiff that his conspiracy claims were deficient for failure to assert facts showing that a conspiracy actually took place.[15] However, granting him the benefit of the doubt and operating on a presumption that he was wishing to challenge the events different from those challenged in <u>Johnson-I</u>, the Court granted Plaintiff leave to amend. <u>See</u> <u>id.</u>, Docket Entry No. 5, n.2 (clarifying that the amended complaint, if filed, would fully supercede the original pleading, even if the amended complaint were to refer to transactions raised in the original complaint, which duplicated <u>Johnson-I</u>).

---

[15] In addition, the Court pointed out that claims against Maynard alleging ineffective assistance were deficient for lack of color of law, that the malicious prosecution claim was unripe because Plaintiff's New Jersey conviction was never overturned, that <u>Miranda</u> challenges were not cognizable in civil rights review, that Confrontation Clause challenges could be raised only with regard to a trial-like setting, etc. <u>See</u> Instant Matter, Docket Entry No. 5.

Now, Plaintiff's motions at bar indicate with clarity that he has no challenges other than those raised in Johnson-I. Therefore, the instant matter will be terminated as duplicative.

> The power of a federal court to prevent duplicative litigation is intended "to foster judicial economy and the 'comprehensive disposition of litigation,'" Curtis v. Citibank, N.A., 226 F.3d 133, 138 (2d Cir. 2000) (quoting Kerotest Manufacturing Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180, 183 (1952)), and "to protect parties from 'the vexation of concurrent litigation over the same subject matter.'" Id. (quoting Adam v. Jacobs, 950 F.2d 89, 93 (2d Cir. 1991)).

Porter v. NationsCredit Consumer Disc. Co., 2003 Bankr. LEXIS 933, at *33 (Bankr. E.D. Pa. 2003).

Plaintiff's instant claims, be they assertions or the exhibits upon which Plaintiff relied for the purposes of his pleading and his motions, will be read jointly with his Johnson-I challenges. See In re Synchronoss Secs. Litig., 705 F. Supp. 2d 367, 390 (D.N.J. 2010) (quoting Jackson v. Broad. Music, Inc., 2006 U.S. Dist. LEXIS 3960, at *18 (S.D.N.Y. Jan. 31, 2006), for the observation that "the court may take judicial notice of . . . 'admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action' without converting the motion into one for summary judgment"), quoting, in turn, Harris v. New York State Dep't of Health, 202 F. Supp.

2d 143, 173 (S.D.N.Y. 2002), and citing <u>Munno v. Town of</u>
<u>Orangetown</u>, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005)).


II.  STANDARD OF REVIEW

    Plaintiff keeps insisting that his pleading "should not be
dismissed unless it appears that the [P]laintiff can prove no set
of facts which would entitle him to relief," as stated in <u>Conley</u>
<u>v. Gibson</u>.  <u>See</u> Instant Matter, Docket Entry No. 13, at 3-4.
Plaintiff errs.

    As this Court has already explained, the pleading standard
of Rule 8 is that detailed in <u>Iqbal</u>; thus, Plaintiff cannot plead
his mere guesses or his self-serving deducements, speculations,
bold conclusions, or mere elements of his claims; moreover, it is
insufficient for him to merely plead the facts compatible with a
wrongful conduct.  His facts should show that the alleged wrong
was *more* than possible.  <u>See Iqbal</u>, 556 U.S. 696 ("[W]ithout some
further factual enhancement, [the complaint] stops short of the
line between possibility and plausibility").  Moreover, Plaintiff
cannot obtain the facts he has to plead by conducting discovery:
he would become entitled to conduct discovery after he states the
facts amounting to a *plausible* claim.  <u>See Iqbal</u>, 556 U.S. at 686
("[T]he question [of sufficiency of] pleadings does not turn [on]
the discovery process. [The plaintiff] is not entitled to

14

discovery [where the complaint asserts some wrongs] 'generally,' [_i.e._, as] a conclusory allegation").


III. SUBSTANTIVE DEFICIENCIES

One of Plaintiff's claim is that of conspiracy between Maynard, Plaintiff's prosecutor and his state judge.  In a line of cases beginning with Griffin v. Breckenridge, 403 U.S. 88 (1971), the Supreme Court has made clear what a § 1985 plaintiff must allege facts showing: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States."  United Bhd. of Carpenters & Joiners v. Scott, 463 U.S. 825, 828-29 (1983) (citing Griffin, 403 U.S. at 102-03).[16]

_____

[16]  Despite its application to private conspiracies, § 1985(3) was not intended to provide a federal remedy for "all tortious, conspiratorial interferences with the rights of others," or to be a "general federal tort law."  Griffin, 403 U.S. at 101-02.  The Griffin Court emphasized that, because § 1985(3) requires the "intent to deprive of equal protection, or equal privileges and immunities," a claimant must allege "some [class-based] invidiously discriminatory animus behind the conspirators' action."  Id. at 102 (emphasis removed).  There are two distinct aspects to such a claim: a plaintiff must allege

While the courts are "mindful that direct evidence of a conspiracy is rarely available and that the existence of a conspiracy must usually be inferred from the circumstances . . . , the rule is clear that allegations of a conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." <u>Capogrosso v. Supreme Ct. of N.J.</u>, 588 F.3d 180, 184-85 (3d Cir. 2009) (quoting <u>Crabtree v. Muchmore</u>, 904 F.2d 1475, 1481 (10th Cir. 1990)).

Here, Plaintiff failed to assert facts stating a viable conspiracy claim. He showed no conspiratorial animus against him on the part of the prosecutor: indeed, Hill and Spence, both African-Americans, were also prosecuted and also offered pleas.[17] Analogously, Plaintiff failed to allege any facts showing concerted actions between Maynard and the prosecutor: he merely offered this Court his deducement based on the facts that: (1) Maynard sought two adjournments, while the prosecutor sought three; and (2) for a period of time, Hill was, allegedly,

---

facts showing that the conspiracy was motivated by discriminatory animus against an identifiable class and, in addition, the facts showing that the discrimination was invidious. <u>See</u> <u>Aulson v. Blanchard</u>, 83 F.3d 1, 4-5 (1st Cir. 1996).

[17]  Since Maynard did not represent either Hill or Spence, it is self-evident that there could not have been any conspiracy between Maynard and the prosecutor as to Hill and Spence.

violating the terms of her release.  These two facts do not support a plausible claim; they hardly state a possible one.[18] Simply put, Plaintiff cannot convert his disappointment with being taken into federal custody upon conclusion of his New Jersey prosecution into a viable claim.  A criminal defendant has no constitutional right to a dismissal of his charges during the brief interim when one of the government witnesses is missing.  A fortiori, a criminal defendant has no constitutional right to release facilitating his escape from the reach of law enforcement authorities.  Cf. Acevedo v. CFG Health Sys. Staff, 2010 U.S. Dist. LEXIS 120136, at *21 (D.N.J. Nov. 12, 2010) ("Plaintiff's claim [if taken to its logical conclusion] would turn civil rights law upon its head").

Plaintiff's other claim, asserting that the SUV was stopped and he was arrested without probable cause is contradicted by the very exhibits upon which he relied in his original and amended pleadings filed here, and in his motions.  "The proper inquiry in a Section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense but whether the

---

[18]  Two applications for adjournment by a defense counsel, or three applications for adjournment by a prosecutor cannot show a concerted action.  Had it been otherwise, every prosecution could be labeled "conspiratorial."  Moreover, if Hill were, in fact, temporarily violating her terms of release, the prosecutor was obligated to procure Hill's attendance by all reasonable means and, hence, properly sought adjournments while attempting to locate and produce Hill.

arresting officers had probable cause to believe the person arrested had committed the offense." <u>Dowling v. City of Phila.</u>, 855 F.2d 136, 141 (3d Cir. 1988). "[W]hen an officer has probable cause to believe a person committed even a minor crime[,] . . . the balancing of private and public interests is not in doubt [and t]he arrest is constitutionally reasonable." <u>Virginia v. Moore</u>, 553 U.S. 164, 171 (2008). Correspondingly, a plaintiff must state "the facts [showing that, under the] circumstances within [the officer's] knowledge, a reasonable officer could not have believed that an offense had been or was being committed by the person to be arrested." <u>Mosley v. Wilson</u>, 102 F.3d 85, 94-5 (3d Cir. 1996); <u>accord</u> <u>Revell v. Port Authority of New York, New Jersey</u>, 598 F. 3d 128, 137 n.16 (3d Cir. 2010).

Here, Plaintiff's exhibits show that the police officers stopped the SUV and searched its occupants on the basis of the information provided by the Wawa store manager about Hill's attempt to commit fraudulent purchases. That information, in and by itself, already supplied a sufficient probable cause for the stop and search. When the search produced a large amount of cash, stolen credit cards, fraudulent driver licenses and Social Security documents issued to other persons' names, that discovery, in and by itself, supplied a sufficient probable cause for arrest of all four occupants, as well as for investigation of the SUV. Thus, Plaintiff's exhibits filed here negate his false

arrest challenges.  Accord Gutierrez v. Peters, 111 F.3d 1364,

1374 (7th Cir. 1997) ("[A] plaintiff can plead himself out of

court by alleging facts which show that he has no claim . . . .

Allegations in a complaint [or relied upon in a complaint] are

binding admissions . . . and admissions can of course admit the

admitter to the exit from the federal courthouse") (quoting

Jackson v. Marion County, 66 F.3d 151, 153 (7th Cir. 1995)).

     Plaintiff's next claim is that of selective law enforcement

and selective prosecution.[19]  "A decision to prosecute is

selective and violates the right to equal protection when it is

made on a discriminatory basis with an improper motive." United

States v. Schoolcraft, 879 F.2d 64, 68 (3d Cir. 1989).  To state

a selective prosecution claim, a plaintiff must "provide evidence

that persons *similarly situated* have not been prosecuted." Id.

(emphasis supplied); see also Yick Wo v. Hopkins, 118 U.S. 356

(1886) (holding officials liable for "illegal discrimination"

when they "applied and administered" a facially neutral law "with

an evil eye and an unequal hand").  Thus, two factors must be

_____

     [19]  The claims of "selective prosecution" and "selective
enforcement" are different Fourteenth Amendment claims, and when
a plaintiff's allegations allege solely police misconduct, the
claim should be for selective enforcement, while claims adding an
allegedly wrongful prosecutorial conduct yield a selective
prosecution challenge.  See Davis v. Malitzki, 451 F. App'x 228,
2011 U.S. App. LEXIS 23029, at *17, n.11 (3d Cir. Pa. 2011)
(citations omitted).  "However, the standards are virtually
identical." Id.

19

proved, namely, that persons *similarly situated* were not prosecuted, and that the decision to prosecute was made on the basis of an *unjustifiable standard*, such as race, religion or "some other arbitrary factor." Schoolcraft, 879 F.2d at 68 (emphasis supplied).

The distinction in the circumstances of the underlying transaction is the factor decisive for the purposes of the equal protection analysis. For instance, in Crane v. Cumberland County, 64 F. App'x 838 (3d Cir. 2003), the Court of Appeals found plaintiffs did not demonstrate that others were similarly situated or prosecuted on the basis of his race, since the arrestee was the only person who wielded a knife during the altercation in which he was arrested.

Here, Plaintiff's submissions concede that Salamone and Hill's statements informed the police about only one withdrawal Salamone made with the credit card she knew or suspected stolen, and both Salamone and Hill averred that Salamone passed all funds to Hill, Spence and Plaintiff. Thus, Salamone was not similarly situated to either Plaintiff or Hill/Spence, who conducted systemic and complex fraudulent schemes, and who retained the proceeds of their wrongful acts. Correspondingly, the police officers' election to release Salamone without a charge does not qualify as either unjustifiable or racially motivated. While Plaintiff maintains that the police officers should have further

investigated Salamone and attempted to find inconsistencies in
her statements, or in the statements Hill made about Salamone,
Plaintiff's position plays against him, since he effectively
concedes that there was virtually no inculpatory evidence against
Salamone.  Therefore, Plaintiff's selective enforcement and/or
selective prosecution claims fails to meet the plausibility
benchmark.

Plaintiff also introduced a "racial profiling" claim.
However, that largely mimics the one of selective enforcement,
see Whren v. United States, 517 U.S. 806, 813 (1996), and, hence,
fails here for the reasons already stated supra.  "To prevail on
an equal protection claim in the racial profiling context, [a
plaintiff must] show that the challenged law enforcement practice
had a discriminatory effect and [in addition] was motivated by a
discriminatory purpose."  Carrasca v. Pomeroy, 313 F.3d 828, 834
(3d Cir. 2002).  For the purposes of the first prong of this
inquiry, a plaintiff must "show that [he] is a member of a
protected class and [in addition] that [he] was treated
differently from *similarly situated* individuals in an unprotected
class."  Bradley v. U.S., 299 F.3d 197, 206 (3d Cir. 2002)
(emphasis supplied).  The second prong was examined in Iqbal, 556
U.S. at 676-77, where the Supreme Court pointed out that a
plaintiff asserting an equal protection claim "must plead [the
facts showing] that the defendant acted with a discriminatory

purpose [in order to permit a reasonable inference that the government-official defendant acted] for the purpose of discriminating on account of race."

Here, Plaintiff concedes and his exhibits demonstrate that the police officers were informed by Hill about: (a) Plaintiff being the key player in Hill's and Spence's fraudulent schemes; and (b) Salamone's involvement being limited to a single withdrawal of the cash funds that she did not keep. Therefore, there is a qualitative distinction between Plaintiff and Salamone, and he failed to show that the police released Salamone without a charge because of a discriminatory purpose.

Plaintiff's remaining challenges warrant no review beyond that already provided in this Court's prior decisions, nor do they warrant a <u>vacatur</u> of the Court's prior decisions.[20] Rather, it appears from a closer look at the totality of Plaintiff's submissions made in this matter and in <u>Johnson-I</u> that Plaintiff may not have a single viable challenge. This calls into question the continuation of the appointment of Plaintiff's counsel in <u>Johnson-I</u> where Plaintiff's vague, but exceedingly voluminous and numerous challenges led the Magistrate Judge to conclude that

---

[20]  Plaintiff's <u>Miranda</u> challenges cannot be litigated in a civil action, his claims against Maynard – except for those asserting conspiracy – fail for the lack of color of law, his malicious prosecution claims are unripe in light of his New Jersey conviction never being overturned, etc.

Plaintiff had viable claims but lacked the legal sophistication

to articulate them.   See Instant Matter, Docket Entry No. 68, at

3-4 ("Plaintiff requests the Court grant him pro bono counsel

because he 'has a six grade education,' 'no professional job

skills' and 'no law library at the facility where he is being

housed . . . .  [Therefore,] the Court finds that it will request

pro bono counsel for Plaintiff at this time") (brackets omitted,

emphasis supplied).[21]   Now, a continuation of counsel's

appointment in Johnson-I might prove unwarranted and a waste of a

valuable judicial resource unless Plaintiff shows that he has a

viable claim.

> [F]irst and foremost, the district court considers
> whether an indigent plaintiff raises a discernible
> claim from which at least an arguable merit could be
> distilled.   See Tabron [v. Grace], 6 F.3d [147,] 156
> [(3d Cir. 1993)] ("[T]he district court must consider
> as a threshold matter the merits of the plaintiff's
> claim.  'Before the court is justified in exercising
> its discretion in favor of appointment, it must first
> appear that the claim has some merit in both fact and
> law'") (quoting, inter alia, Maclin v. Freake, 650 F.2d
> 885, 887 (7th Cir. 1981), which, in turn, quoted Spears
> v. United States, 266 F. Supp. 22, 25-26 (S.D.W. Va.
> 1967)) . . . .  Simply put, the presence of a
> discernible claim is a necessary requirement for
> appointing counsel [and for continuing that
> appointment].   See Tabron, 6 F.3d at 156; Maclin, 650
> F.2d at 887; Spears, 266 F. Supp. at 25-26; cf. Fisher
> v. Univ. of Tex. at Austin, 133 S. Ct. 2411, 186 L. Ed.
> 2d 474, 2013 U.S. LEXIS 4701, at *26 (June 24, 2013)
> ("[The] scrutiny must not be 'strict in theory, but

---

[21]   Plaintiff's submissions made in the instant matter
suggest that he was less than forthcoming with the Magistrate
Judge.

```
fatal in fact.'   But the opposite is also true.  [The]
scrutiny must not be strict in theory but feeble in
fact") . . . .
```

_Bacon v. Mandell_, 2013 U.S. Dist. LEXIS 162144, at *18-19 (D.N.J.

Nov. 14, 2013).[22]

IV.  CONCLUSION

        For the foregoing reasons, Plaintiff's motion to amend will

be granted.  His amended pleading filed in this matter, being

read in conjunction with: (a) the exhibits attached to the

original complaint filed here; and (b) the statements he made in

his motions at bar, as well as in _Johnson-I_, will be dismissed

for failure to state a claim.  His motion for reconsideration

will be denied for lack of merit or, in the alternative, as moot.

Because Plaintiff's statements made in the motions at bar

demonstrate that the challenges raised here are wholly

duplicative and attack the transaction already challenged in

_Johnson-I_, the instant matter will be terminated.

        The Clerk will be directed to docket this Opinion and the

Order filed herewith in _Johnson-I_.  The Court will address the

totality of Plaintiff's challenges there; in the interim, the

Court's final determination will be reserved.  Additionally, the

Court's determination as to continuation of the appointment of

---

        [22]  Correspondingly, this Court will direct the Clerk to
docket this Opinion and the accompanying Order in _Johnson-I_ and
will address the issue of appointment of counsel there.

Plaintiff's counsel in <u>Johnson-I</u> will be reserved and addressed in that matter.  An appropriate Order follows.

**s/Renée Marie Bumb**
**RENÉE MARIE BUMB,**
**United States District Judge**

Dated: December 23, 2013